United States Court of Appeals
Fifth Circuit

**F I L E D**

August 19, 2004

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**NO. 02-40719**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**REGINALD BRIGHAM,**

**Defendant-Appellant.**

---

**Appeal from the United States District Court
for the Eastern District of Texas**

---

Before KING, Chief Judge, and JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO and PICKERING, Circuit Judges.

EDITH H. JONES, Circuit Judge:

During a traffic stop near Nacogdoches, Texas, routine questioning of the occupants and a consensual search uncovered over five kilograms of a controlled substance, liquid codeine syrup. The district court denied the appellant's motion to suppress. We granted en banc review of a divided panel decision that reversed the district court and held that the traffic stop was unconstitutionally extended and that the consensual search was improper. Clarifying prior precedents regarding the proper application of the Fourth Amendment in traffic stop cases, we hold

that the state trooper's investigatory procedures in this case were eminently reasonable under the totality of the circumstances. The conviction is **AFFIRMED**.

## I.   BACKGROUND

### A.   The Traffic Stop[1]

On May 14, 2000, Reginald Brigham and three friends were driving on U.S. Highway 59 passing around Nacogdoches, Texas. At 4:13 p.m., State Trooper Shannon Conklin spotted their silver 2000 Buick sedan following too closely behind another vehicle in violation of Texas traffic laws. Conklin stopped the Buick; a videocamera and microphone mounted in the patrol car recorded the entire traffic stop.

Conklin first approached Brigham, the driver, and asked him to step out of the vehicle and provide his license and insurance papers. Brigham complied and produced an Arkansas driver's license and a rental agreement from an Avis branch in Memphis, Tennessee, listing Dorothy Harris, a 50-year-old female who lived in West Memphis, Arkansas, as the lessee. Since none of the occupants appeared to be a 50-year old female, and no additional drivers were authorized on the rental agreement, Conklin became suspicious.

At 4:15 p.m., two minutes into the stop, Conklin began asking Brigham a series of basic questions about the group's travel

---

[1]    The facts are recited in the light most favorable to the Government as prevailing party.

2

plans. Brigham replied that they were coming from Houston, Texas, that one of the passengers had been visiting family members, and that the rest of the group was on vacation. Conklin asked where the group had stayed and Brigham replied that they had stayed in a La Quinta Inn, but he had difficulty explaining where the motel was located. Brigham avoided making eye contact with Conklin, appeared to be extremely nervous, and was responding to Conklin's questions with questions of his own. Conklin's five and one-half years of experience with the Texas Department of Public Safety led him to believe that Brigham was fabricating answers to his questions. Brigham identified Dorothy Harris, the renter of the car, as his mother. Bothered by Brigham's demeanor and answers, Conklin decided to verify Brigham's story with the other occupants of the car.

At 4:17 p.m., Conklin asked the passenger who Brigham had indicated was visiting relatives in Houston to step out of the vehicle. The passenger produced what appeared to be a Tennessee I.D. card with the name "Sircrease D. Brooks." Conklin would soon discover that the I.D. was fictitious and that the passenger's name was actually Brandon Franklin. Conklin questioned Franklin about the group's travel plans. Franklin explained that the group was coming from Houston where they had attended an Isley Brothers concert on Friday night. Conklin then asked Franklin about the specifics of the trip, including what time the group had arrived in Houston, whom they had visited, and where they stayed. Franklin

appeared somewhat confused about the exact time the group had arrived in Houston, first answering Friday evening but then saying he wasn't sure when they arrived. Franklin also mentioned a La Quinta Inn and added that he knew a "couple of girls" in Houston. Notably, Franklin did not state either that he had any relatives in the Houston area or that he was visiting his family. Like Brigham, Franklin avoided eye contact with Conklin and appeared extremely nervous.

At 4:20 p.m., Conklin asked the two remaining passengers for identification and attempted to determine which of the stories he had been told was accurate. The female, Keisha Coleman, indicated that she did not have any identification, and the other male produced an Arkansas card identifying him as Quincy Perry. Perry and Coleman appeared confused and were inconsistent concerning the group's travel plans, as Perry initially stated that they arrived in Houston on Friday morning, while Coleman suggested Saturday.

At 4:21 p.m., now eight minutes into the stop, Conklin returned to his car and initiated computer checks on the Buick and the three identification cards he had received. He noted for the videotape that all three males appeared "extremely nervous." Nevertheless, Conklin had informed Brigham that if his license was "clean," they would soon be on their way. At 4:23 p.m., the registration check on the Buick revealed that the plates matched the vehicle and there was no stolen vehicle report. At the

4

suppression hearing, Conklin testified that he remained suspicious because in his experience, the fact that a car is not yet reported as stolen does not necessarily indicate that the car was not actually stolen. As he awaited the results of the I.D. checks, Conklin continued to make verbal notes about the Buick's occupants, stressing that Brigham and Franklin avoided eye contact with him, all three men appeared extremely nervous, their hands were shaking, and the occupants' stories about their arrival time in Houston and the purpose of their visit were in conflict. In addition, Conklin observed that none of the subjects was 25 years old, consequently, none of them appeared to have the authority legally to possess the rental car.

At 4:29 p.m., the results of the I.D. checks suggested that Franklin's I.D. was likely fictitious. After confirming the I.D. number that he had provided to the dispatcher, Conklin examined Franklin's I.D. more closely and concluded it was a forgery. At approximately 4:31 p.m., Conklin questioned Brigham and learned Franklin's true identity. Franklin, however, continued to insist to Conklin that he was "Sircrease Brooks," until Conklin confronted him about the false I.D. card. Conklin then returned to his patrol car to check Franklin's actual identity.

At approximately 4:34 p.m., while Franklin's I.D. check was still pending, Conklin waved over a Nacogdoches police unit to provide backup and briefed the officers on the situation and his intent to seek consent to search the vehicle. Conklin then

provided Brigham with a written warning for following too closely and returned Brigham's driver's license, while explaining that one of his responsibilities as a state trooper was to intercept illegal contraband such as guns, stolen property, and narcotics. Brigham denied that any illegal items were in the car and acceded to Conklin's request for a search. Conklin first removed all of the passengers from the car and patted them down. While Conklin was searching the Buick, the dispatcher responded with additional information regarding Franklin's identity. At approximately 4:42 p.m., Conklin discovered in the trunk, inside a cooler, a Minute Maid juice container holding what appeared to be liquid codeine. Conklin then arrested all four occupants of the Buick. Lab tests later confirmed that the substance was liquid codeine syrup.

## B. Court Proceedings

On January 11, 2001, Brigham, Franklin, and Perry were indicted by a federal grand jury for possessing more than four kilograms of codeine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Brigham moved unsuccessfully to suppress the evidence discovered during Trooper Conklin's search on the grounds that the stop and search exceeded the bounds of the Fourth Amendment. Brigham then reached a plea agreement, subject to his right to appeal the denial of the motion to suppress.

On appeal, the panel majority held that Trooper Conklin unconstitutionally extended the traffic stop by questioning Brigham

before he began a computer check on the I.D.'s and the rental car's registration.  See United States v. Brigham, 343 F.3d 490, 497-505 (5th Cir. 2003), vacated and reh'g en banc granted by, 350 F.3d 1297 (5th Cir. 2003).  The panel majority also held that Brigham's consent to search the vehicle was "involuntary" because it was tainted by the Fourth Amendment violation.  Id. at 505-07.  The conviction was reversed.  On rehearing en banc, we find no Fourth Amendment violation and affirm the conviction.

## II.  DISCUSSION

Brigham does not here challenge the validity of the initial traffic stop for following too closely.[2]  See Terry v. Ohio, 392 U.S. 1, 88, 88 S. Ct. 1868 (1968); see TEX. TRANS. CODE § 545.062(a) (Vernon 1999) ("An operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles").  Rather, Brigham argues that Trooper Conklin exceeded the scope of the valid stop and prolonged the occupants' detention excessively and unconstitutionally when, after determining that neither Brigham nor the other occupants of the rental car were its authorized drivers, Conklin interrogated them about their travel

---

[2]      To assess a district court's ruling on a motion to suppress evidence under the Fourth Amendment, we review its factual determinations for clear error and the ultimate Fourth Amendment conclusions de novo.  United States v. Gonzalez, 328 F.3d 755, 758 (5th Cir. 2003) (citing Ornelas v. United States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663 (1996) (other citations omitted)).  The evidence is considered in the light most favorable to the prevailing party.  Id. (citing United States v. Orozco, 191 F.3d 578, 581 (5th Cir. 1999)).

7

plans and then instituted computerized vehicle and I.D. checks.[3]

The stopping of a vehicle and detention of its occupants constitutes a "seizure" under the Fourth Amendment. This court, following the Supreme Court, has treated routine traffic stops, whether justified by probable cause or a reasonable suspicion of a violation, as Terry stops.[4] See Berkemer v. McCarty, 468 U.S. 420, 439, 104 S. Ct. 3138, 3150 (1984); Pennsylvania v. Mimms, 434 U.S. 106, 109, 98 S. Ct. 330, 332 (1977) (per curiam); see e.g., United States v. Dortch, 199 F.3d 193, 198 (5th Cir. 1999).

Pursuant to Terry, the legality of police investigatory stops is tested in two parts. Courts first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. See Terry, 392 U.S. at 19-20, 88 S. Ct. at 1879. Brigham suggests, and the panel majority agreed, that the Fourth Amendment required Conklin to return to the patrol car immediately after he learned that none of

---

[3] The Government does not dispute Brigham's standing, as the vehicle's driver, to attack the constitutionality of the search. Compare United States v. Shabazz, 993 F.2d 431, at 434 n.1 (5th Cir. 1993), citing Rakas v. Illinois, 439 U.S. 128, 99 S. Ct. 421 (1978).

[4] The Government does not contend that Officer Conklin's stop of Brigham was a stop based on probable cause, and therefore, we apply the standard Terry analysis. However, it is important to note that at least one of our sister circuits has recently suggested that different constitutional standards may apply to stops based on probable cause. See United States v. Childs, 277 F.3d 947, 952-54 (7th Cir. 2002) (en banc) (noting that the Fourth Amendment allows for a broader range of law enforcement actions where a traffic stop is supported by probable cause); see also Berkemer v. McCarty, 468 U.S. 420, 439 n.29, 104 S. Ct. 3138, 3150 n.29 (1984) ("We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a Terry stop.").

the occupants seemed to be an authorized driver and undertake a registration check to determine whether the Buick had been reported stolen. This approach misunderstands the Supreme Court's insistence on reasonableness rather than prescriptions for police conduct under the Fourth Amendment and extends this circuit's precedents too far. The correct analysis requires district courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances.

The Supreme Court has long held that the "touchstone of Fourth Amendment analysis is reasonableness." Ohio v. Robinette, 519 U.S. 33, 39, 117 S. Ct. 417, 421 (1996) (quoting Florida v. Jimeno, 500 U.S. 248, 250, 111 S. Ct. 1801, 1803 (1991)) (internal quotation marks omitted). Reasonableness requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement. Mimms, 434 U.S. at 109, 98 S. Ct. at 335. Reasonableness, measured "in objective terms by examining the totality of the circumstances," "eschew[s] bright-line rules, instead emphasizing the fact-specific nature of the . . . inquiry." Robinette, 519 U.S. at 39; see also Florida v. Royer, 460 U.S. 491, 506, 103 S. Ct. 1319, 1329 (1983) (rejecting "a litmus-paper test" and recognizing that "there will be endless variations in the facts and circumstances" and therefore, "it is

9

unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment"). Finally, the Supreme Court has emphasized that courts must allow law enforcement "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 750-51 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418, 101 S. Ct. 690, 695 (1981)).

Under the second prong of the Terry test, the question before the court is whether Conklin's actions after he legitimately stopped the Buick were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop. This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges. Dortch, 199 F.3d at 200; United States v. Machuca-Barrera, 261 F.3d 425, 434 (5th Cir. 2001).

Like other circuits,[5] this court has found no constitu

---

[5]    See, e.g., United States v. Givan, 320 F.3d 452, 459 (3rd Cir. 2003) (noting that "questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop"); United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002) ("An officer does not violate the Fourth Amendment by asking the driver his destination and purpose, checking the license and registration, or requesting that the driver step over to the patrol car."); United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc) (noting that questions relating to a motorist's travel plans are ordinarily related to the reason for the stop); United States v. Hill, 195 F.3d 258, 268 (6th Cir. 1999) (holding that an

10

tional impediment to a law enforcement officer's request to examine a driver's license and vehicle registration or rental papers during a traffic stop and to run a computer check on both. See, e.g., Dortch, 199 F.3d at 198 (citing Shabazz, 993 F.2d at 437). An officer may also ask about the purpose and itinerary of a driver's trip during the traffic stop. See, e.g., United States v. Gonzalez, 328 F.3d 755, 758-59 (5th Cir. 2003). Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made.[6] All these inquiries are within the scope of investigation attendant to the traffic stop.

But even more important, we "reject any notion that a police officer's questioning, even on a subject unrelated to the purpose of a routine traffic stop, is itself a Fourth Amendment violation." Shabazz, 993 F.2d at 436 (emphasis added). "[D]etention, not questioning, is the evil at which Terry's second prong is aimed." Id. The Fourth Amendment is concerned with ensuring that the scope of a given detention is reasonable under

---

officer's questioning of the defendant "as to his moving plans at the outset of the stop was reasonable in that the questions related to [the defendant's] purpose for traveling"). United States v. Sowers, 136 F.3d 24, 27-28 (1st Cir. 1998); United States v. Hardy, 855 F.2d 753, 757 (11th Cir. 1998).

[6] For example, by posing these types of questions at the outset of a stop, an officer may discover an extenuating circumstance, e.g., that a given driver was speeding in order to get his pregnant wife to the hospital. See United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc) (explaining that a motorist's travel plans typically relate to the purpose of a traffic stop because the motorist is traveling at the time of the stop and might explain, or put into context, the reasons why the motorist may have been in violation of the traffic laws).

11

the totality of the circumstances.  See United States v. Roberson, 6 F.3d 1088, 1092 (5th Cir. 1993).  Mere police questioning, without some nonconsensual restraint on one's liberty, is not a "seizure" or detention.  Florida v. Bostick, 501 U.S. 429, 434, 115 S. Ct. 2382, 2386 (1991).  Indeed, this court has recently noted that a consensual interrogation may follow the end of a valid traffic stop and that such consensual encounters do not implicate Fourth Amendment concerns.  United States v. Sanchez-Pena, 336 F.3d 431, 442-43 (5th Cir. 2003).

Based on these authorities, Trooper Conklin's questioning of Brigham and his companions was fully within the scope of the detention justified by the traffic stop, particularly after Conklin ascertained that (1) Brigham was not the owner or lessee of the vehicle, (2) the lessee was not present in the Buick, and (3) Brigham's and Franklin's versions of their itinerary conflicted.  This court has consistently approved a police officer's questioning a driver's travel plans where the driver was not the authorized vehicle lessee or otherwise appeared to lack driving authority.[7]  Further, as the Eighth Circuit has noted, the Fourth Amendment permits "[a] police officer [to] undertake similar questioning of the vehicle's occupants to verify the information provided by the driver."  Linkous, 285 F.3d at 719.  Conklin's

_____

[7] United States v. Jones, 234 F.3d 234, 237-41 (5th Cir. 2000); Dortch, 199 F.3d at 195-200; see also Roberson, 6 F.3d at 1090-93; Gonzales, 328 F.3d at 756-59.

12

increasing suspicion was also fueled by Brigham's extreme nervousness, his avoidance of eye contact, and his pattern of answering the officer's questions with questions of his own. Conklin had a right to rely on his experience in concluding that such actions indicate that an individual may be lying.

Finally, this process, from the time Trooper Conklin started questioning Brigham until he returned to his patrol car to check the registration and I.D.'s provided by Brigham and the others, lasted only seven minutes. Conklin's questioning exemplified a graduated response to emerging facts. We cannot say that Conklin's actions to this point were anything but reasonable under the circumstances, and they effectuated the purpose of the stop.

Equally within the legitimate scope of the stop were the registration and license checks that Conklin then initiated on the vehicle and its occupants. This procedure would have been permissible even without the additional information he had gleaned, which led to a reasonable suspicion that, at the very least, the vehicle might have been stolen.[8] See Dortch, 199 F.3d at 199. While the dispatcher promptly informed Conklin that the Buick had not been reported stolen, Conklin reasonably waited for the I.D. checks to

_____

[8] The circumstances of a stop may also give rise to reasonable suspicion of other criminal activity beyond automobile theft. Dortch excluded drug trafficking as a basis for reasonable suspicion on the facts of that case, where the driver's license check had come back clean. See Dortch, 199 F.3d at 199. But in another case, we have found that a driver's nervousness, hesitation in responding to basic itinerary questions, lies about identification, presence on a drug trafficking corridor, and prior arrests for drug trafficking, taken together, gave rise to a reasonable and articulable suspicion of drug trafficking. See Gonzalez, 328 F.3d at 758.

13

be completed, because in his experience, the fact that a vehicle has not yet been reported stolen does not necessarily mean that the vehicle has not actually been stolen. The Supreme Court has emphasized the importance of allowing officers to "draw on their own experience and specialized training" to make just such inferences from the facts available to them. See Arvizu, 534 U.S. at 273.[9]

Once Conklin learned that Franklin's I.D. was likely false, Conklin acted reasonably, with further questioning, to uncover Franklin's true identity and perform a correct background check. It was while the background check on Franklin was in progress that Conklin requested and obtained consent from Brigham to search the vehicle. Thus, as in Shabazz, "[b]ecause [Conklin was] still waiting for the computer check at the time that [he] received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation." Shabazz, 993 F.2d at 437.

In sum, Conklin's actions were reasonable under the circumstances and the detention as a whole was reasonable. As the district court summarized, "[t]he absence of the authorized driver, the inconsistent explanation as to the trip to Houston, and

---

[9] See also, Sanchez-Pena, 336 F.3d at 437-38; United States v. Nelson, 284 F.3d 472, 482 (3rd Cir. 2002) (noting the "great deference" afforded to an officer's experience and suggesting that under Arvizu, law enforcement experience and training become "the focal point of the [Fourth Amendment reasonableness] analysis").

14

Franklin's presentation of a fictitious I.D., taken together, justified Trooper Conklin's continued detention of defendants."

Because the en banc court reaches a different result than does the dissent, it is useful to explain how our analyses diverge. The dissent, like the panel majority, concludes that under our circuit's precedent, Conklin unconstitutionally extended the detention of Brigham and his passengers by questioning them about their travel plans <u>before</u> running a computer check on the vehicle's registration. This conclusion embodies three critical mistakes: a misreading of Fifth Circuit precedent; an improper stopwatch on the length of permissible detention; and an erroneous insistence on "least intrusive means" in the <u>Terry</u>-stop analysis.

First, the dissent extends three of this court's traffic stop cases well beyond their facts and reasoning. See <u>Dortch</u>, 195 F.3d at 195-201; <u>Jones</u>, 234 F.3d at 236-43; <u>United States v. Santiago</u>, 310 F.3d 336, 337-42 (5th Cir. 2002).[10] In each case, following an initially valid traffic stop, patrol officers obtained negative results on computerized driver's license and vehicle registration checks but continued to detain the drivers without reasonable suspicion until they received consent to search the cars. This court suppressed evidence of illegal drugs turned up by

_____

[10] The Government does not ask this en banc court to reconsider these cases.

15

the searches.[11] The panel and the dissent interpret these cases to support a conclusion that Conklin's questioning about the occupants' itinerary was "unrelated" to any stolen rental car issue and unduly prolonged their detention. As a result, the dissent would apply these prior cases to limit the quantity, scope and timing of questions that may be asked during a stop.

With due respect to our colleagues, these cases set up no such inflexible rules. The cases are about timing and sequence: after the computer checks came up "clean," there remained no reasonable suspicion of wrongdoing by the vehicle occupants. Continued questioning thereafter unconstitutionally prolonged the detentions. See also United States v. Valadez, 267 F.3d 395, 398-99 (5th Cir. 2001). Moreover, in Dortch and Jones, the extended detentions were reinforced by the officers' retention of the suspects' drivers' licenses. See Dortch, 199 F.3d at 198; Jones, 234 F.3d at 238. This court has not forbidden questioning that included, inter alia, the drivers' and passengers' itinerary as a legitimate investigatory device in the first instance. None of the cases demands a particular series of questions be asked — or not asked — within the scope of a traffic stop, so long as the overall detention is justified by reasonable suspicion. Moreover, none of these cases implies that questions about the occupants' travel plans are related solely to drug interdiction and therefore

---

[11] In each case, the oral or written consent to search given by the driver was held tainted by the unconstitutionally prolonged detention.

16

necessarily fall outside the scope of a traffic stop. The dissent's implications to the contrary are unsupported by common sense, by the very precedents they rely on, and by the rule that courts may not scrutinize the motives behind otherwise permissible police actions. United States v. Whren, 517 U.S. 806, 811-13, 116 S. Ct. 1769, 1773-74 (1996).

That the traffic stop was extended for a few minutes by Conklin's preliminary questioning is undeniable. But this process required as long as it did for reasons beyond Conklin's control. There were four occupants in Brigham's car, and Brigham's and Franklin's inconsistencies and evasions created suspicion, requiring further detective efforts by Conklin. The dissent challenges the reasonableness of Conklin's actions by noting that, had he looked closer at the Buick's rental papers, he would have observed that Brigham and Dorothy Harris shared the same address and that, as a 50-year-old woman, she was of the right age to be Brigham's mother. This is an easy conjecture in hindsight, but it is unsupported by the district court's fact-findings. In any event, the discrepancy between Dorothy Harris's name as lessee and Brigham as driver, together with the fact that none of Brigham and his companions appeared old enough to drive a rental car, gave cause for further inquiry. The dissent's concern that questioning unrelated to the purpose of a traffic stop may unconstitutionally extend a detention is valid, in abstract terms, but not on the facts of this case.

17

Second, neither our prior cases nor any other caselaw of which we are aware institutes a per se rule requiring an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions.[12] The dissent seems to conclude that allowing questioning, even legitimate questioning, <u>before</u> initiating computer checks[13] constitutes an end-run around <u>Dortch</u> and <u>Jones</u> and, by its inefficiency, unconstitutionally prolongs the detention.[14] There is, however, no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." <u>Sharpe</u>, 470 U.S. at 686 (citing <u>Michigan v. Summers</u>, 452 U.S. 692, 701 n.14 (1981)); <u>see</u> <u>also</u> <u>United States v. Hardy</u>, 855 F.2d 753, 759 (11th Cir. 1988) ("the most important factor [for courts to consider] is whether the

---

[12]    Indeed, in both <u>Jones</u> and <u>Santiago</u>, the officers interrogated the drivers and their passengers before initiating the relevant computer checks, and this court did not criticize the order of investigation. <u>Jones</u>, 234 F.3d at 237-42; <u>Santiago</u>, 310 F.3d at 337-42.

[13]    The panel majority implies that the results of such checks are necessarily definitive, but as Trooper Conklin observed, the fact that a vehicle has not yet been reported stolen does not prove that it has not been actually stolen. Moreover, an officer might find such checks unnecessary if the license and registration information are regular and the driver and occupants answer questions clearly.

[14]    The dissent's logic suggests that had Trooper Conklin initiated the computer checks and then returned to the Buick to ask the same questions while the checks proceeded, such questioning would have been wholly permissible under the <u>Shabazz</u> and the <u>Dortch</u> line of cases. Oddly, then, according to the dissent, questions that would be permissible if posed during a computer check somehow become impermissible when asked before a computer check.

18

police detained [the defendants] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference"). Computerized license and registration checks are an efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in particular sequence with, other efficient means. Some lines of police questioning before the initiation of a computer check are often reasonable, as they may enable swift resolution of the stop. On the facts of this case, Trooper Conklin's investigative methods were reasonable, proceeded with deliberation in response to evolving conditions, and evince no purposeful or even accidental unnecessary prolongation.

Third, by prescribing the scope, duration and order of Conklin's investigation, the dissent would impose a "least intrusive means" test contrary to express statements of the Supreme Court. See Sharpe, 470 U.S. at 687 ("the fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable.") (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)) (internal quotation marks omitted). Instead, the Court holds, "the question is not simply whether some other alternative existed, but whether the police acted unreasonably in failing to recognize and pursue it." Id. Sharpe also cautioned courts against engaging in "unrealistic second-guessing," and noted that "creative judge[s] engaged in post hoc evaluation of police conduct

19

can almost always imagine some alternative means by which the objectives of the police might have been accomplished." Id. at 686-87. A requirement like the one articulated by the panel and implied by the dissent — that there is a single, formulaic approach that an officer must adopt in order to allay his reasonable suspicions during a traffic stop — would engraft upon the Fourth Amendment the very type of bright-line rule the Supreme Court has consistently eschewed. See, e.g., Robinette, 519 U.S. at 39.

For the reasons discussed above, we do not presume to prescribe in the abstract the scope of questioning, investigative techniques, or length of permissible detention that may be undertaken following a valid traffic stop. The bounds of existing caselaw are clear, if fact-intensive: a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop. Because Trooper Conklin's actions were not unreasonable under the circumstances of this case, the detention of Brigham and his companions did not violate the Fourth Amendment.

Absent a Fourth Amendment violation, Brigham's consent to search the vehicle was not unconstitutionally tainted. See Gonzalez, 328 F.3d at 759. Further, the record supports the district court's determination that Brigham's consent was voluntarily given as an independent act of free will. Id. (citing

20

United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir. 1993)).  The evidence gathered from the Buick was thus properly obtained as the result of a consensual search.

### III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**

DeMOSS, dissenting, joined by WIENER, STEWART, and DENNIS:

Because the majority opinion neither accurately reflects the facts as they occurred in this traffic stop nor our law concerning traffic stops, I respectfully dissent. There are four aspects of the majority opinion that are the focus of my dissent. First, because the majority gives only a bare summary of the facts, I put forth a more comprehensive statement of what actually occurred during the traffic stop.[15] Second, the majority's assertion that reasonable suspicion existed to extend the stop is not supported in either law or fact. Third, the majority misapplies the Supreme Court's and our Circuit's case law concerning traffic stops. Fourth, I address the dangers inherent in the majority's opinion and the erosion of constitutional rights which it permits.

## I. The Facts in the Record.

Shortly after 4:00 P.M., on Sunday, May 14, 2000, while turning his patrol car around on an overpass, Trooper Shannon Conklin of the Texas Department of Public Safety ("Trooper Conklin") observed a late model Buick sedan northbound in the outside lane following the vehicle in front of it too closely over a rise in the highway. Trooper Conklin decided to pull over this vehicle, which contained three young black males and one young black female.

---

[15] The circumstances of the traffic stop and subsequent interrogation and search are recorded on a video tape in the record which is the best available evidence of the these facts. The summary in this dissent is close to a verbatim transcript of that videotape.

After making the stop, he approached the car on foot at approximately 4:13 P.M. and asked the driver to produce his driver's license and vehicle registration and to step out of the car and move back behind the car to an area in front of the patrol vehicle.[16] The driver complied and gave Trooper Conklin his Arkansas driver's license and a copy of the rental agreement for the car. The driver's license identified him as Reginald Brigham and the rental agreement identified the lessee as Dorothy Harris.[17]

Trooper Conklin testified later that while reviewing the license and rental contract, he immediately noticed that the 50-year-old woman who had rented the car was not present, and this aroused his suspicion that the car might be stolen. Standing in the ditch in front of the patrol vehicle, Brigham asked why he had been pulled over and Trooper Conklin explained that Brigham was following too closely and Trooper Conklin thought the passenger in the front seat may not have been wearing a seatbelt. Instead of promptly initiating a computer check on Brigham's driver's license or the car's license plate and papers, which would be a means of investigation that was likely to confirm or dispel suspicion about the car being stolen quickly, Trooper Conklin began to question Brigham, asking him where he was coming from and the purpose of his

---

[16] These requests are standard operating procedure for an officer intending to issue a ticket or warning for a traffic citation.

[17] It is clear under our precedents that at this point Trooper Conklin effected a seizure of Brigham under our Fourth Amendment law and detention began.

23

travel. Brigham answered that he had been in Houston on pleasure and one of the passengers had visited family in Houston. Trooper Conklin continued, asking Brigham which part of Houston they had stayed in and where they had stayed. Brigham answered that he did not know in which part of Houston they had stayed and, after pausing for a moment, answered that they stayed at a La Quinta Inn. Trooper Conklin asked which part of Houston the La Quinta was located in, to which Brigham first replied that he was not sure and then said he thought it was the North Highway 59 area. Trooper Conklin then asked Brigham when he had arrived in Houston; Brigham said Friday. Trooper Conklin persisted, asking Brigham to specify what time on Friday he had arrived. Brigham responded that they had arrived Friday morning. After three to four minutes of this questioning, Trooper Conklin turned to the rental agreement and asked Brigham who had rented the car. Brigham responded that his mother, Dorothy Harris, had rented it. Trooper Conklin asked where she was; Brigham told him that she was in Arkansas.

Trooper Conklin later testified that he became suspicious because: (1) the woman who rented the vehicle listed her age as 50 and thus could not have been in the car; and (2) Brigham did not share the same last name as the person who rented the car. Despite noticing the renter's age and last name, however, Trooper Conklin testified at the suppression hearing that he did not notice that: (1) the address on Brigham's driver's license was the same as the home address listed by Harris on the rental agreement; or, (2) at

24

50, Harris was of an age that she could be Brigham's mother. Trooper Conklin also testified at the suppression hearing that Brigham seemed nervous, that his hands were shaking, and that he tended to answer a question with a question.[18]

Next, Trooper Conklin asked Brigham to point out the passenger who had family in Houston, and also asked if Brigham had any weapons. Brigham appeared to indicate it was Brandon Franklin, who was seated in the back seat, that had family in Houston; Brigham also responded that he had no weapons. This was just after 4:17 P.M. and Trooper Conklin remarked at this time that he wanted to find out in which part of Houston the friend had family.[19] Trooper Conklin approached the car, asked Franklin to step out of the vehicle and go in front of the car off the shoulder and into the grass, and requested Franklin's driver's license. The license, which later turned out to be fictitious, identified Franklin as Siracrease Brooks. Trooper Conklin began to ask Franklin the same battery of questions that he had asked Brigham. Trooper Conklin first asked where they were coming from. Franklin responded that they had been in Houston and had gone to see an Isley Brothers

[18]     Although Brigham's responses on the videotape are slightly unclear, there were only two instances where Brigham answered a question with a question and in both instances it appeared Brigham did not understand Trooper Conklin's question or could not hear the question because of the traffic noise from the busy highway. The videotape does not clearly show nervousness.

[19]     The two suspicions of criminal conduct which could legitimately be in Trooper Conklin's mind at this point were: (1) was the Buick car following too closely; and (2) was the Buick stolen. It is beyond my comprehension as to what relevance this subject that Trooper Conklin said he needed to explore had on either of these issues.

concert. Trooper Conklin asked when they went to the concert; Franklin said Friday night. Trooper Conklin asked how long they had been in Houston, and Franklin said they had been there a couple of days. Trooper Conklin asked what day and time they had arrived. Franklin initially said Friday late afternoon or evening, but then stated that he was not exactly sure of their arrival time. Trooper Conklin continued by asking Franklin whether he stayed with friends or family. Franklin said they had stayed at a hotel. Trooper Conklin asked which hotel; Franklin said a La Quinta, as had Brigham. Trooper Conklin asked how often Franklin went to Houston and whether he knew anyone there. Franklin responded that he did not go there often and that he knew "a couple of girls" in Houston that he had met at a college function. Trooper Conklin never specifically questioned Franklin if he had family in Houston.

Between 4:19 and 4:20 P.M., Trooper Conklin next approached the vehicle and asked similar questions of the remaining two occupants, Quincy Perry and the young female who had no identification. Trooper Conklin asked where they were coming from, and whether the visit was for business or pleasure. Perry responded that they had been in Houston for pleasure. Trooper Conklin asked how long they had been there, and Perry said a couple of days. Trooper Conklin asked which day they had arrived, and Perry initially responded that they had arrived Friday morning, but the woman suggested that perhaps it was Saturday morning. Perry then stated that they had stayed one day and two nights. When

26

Trooper Conklin indicated that they could not have arrived Saturday morning and stayed two nights, Perry seemed to indicate that they had left home Thursday night and arrived in Houston Friday morning.[20]

Finally, at 4:21 P.M., after almost eight minutes of questioning the driver and the three passengers about matters unrelated to the basis for the traffic stop, i.e., following too close, and unrelated to the circumstance of being in the rental car, Trooper Conklin returned to his patrol car to radio in the personal and rental car identification information. Almost immediately, the dispatcher reported that the rental car had not been reported stolen. Then for nearly five minutes there was silence and no activity during which Brigham stood in the ditch behind the rental car, Franklin waited in the ditch in front of the rental car, the other passengers remained in the rental car, and Trooper Conklin waited in his patrol vehicle to hear back from his radio contact on the driver's licenses he had collected. While waiting, Trooper Conklin recorded orally on the videotape a message to himself that: (1) as to the rental agreement, the subjects were neither 25 years old nor listed on the rental agreement (Harris had rented the car); (2) the subjects seemed nervous (hands were shaking) and neither Brigham nor Franklin had made eye contact with

---

[20]    Unfortunately, the videotaped conversation involving the woman and Perry is not completely clear. But after some confusion, they seem to indicate that they left Thursday night and arrived Friday morning in Houston.

27

Trooper Conklin; (3) all four individuals appeared to lack legal standing as to the vehicle because they were not listed as authorized drivers; and (4) they had conflicting stories about their arrival time in Houston and who they had visited there.

At 4:29 P.M., eight minutes after receiving radio contact from Trooper Conklin, the dispatcher reported that: (1) Perry and Brigham had some criminal activity in their backgrounds, but their licenses were clear and criminal details were unavailable; and (2) the license Franklin offered was likely fictitious.

Then, Trooper Conklin emerged from his car and aggressively asked Brigham what Franklin's name and age was. After initially not understanding Trooper Conklin's question, Brigham responded that his first name was Brandon, and thought his full name was Brandon Franklin. Trooper Conklin then confronted Franklin. Franklin initially tried to maintain the fake identity but then admitted that his name was Brandon Franklin. Trooper Conklin then asked for Franklin's wallet and searched it but found nothing.[21] Thereafter, around 4:33 P.M., Trooper Conklin called in the new identification and waived over a local Nacogdoches police car for backup. He briefed the local police officers on the situation, and remarked to the officer that he was going to try to get consent to search but would search the vehicle anyway because none of the four

---

[21]     I am not aware of any statute or rule of law which authorized Trooper Conklin to search the wallet of Franklin under these circumstances.

28

had standing to protest.[22]

After speaking to the local police, Trooper Conklin issued Brigham a written warning for driving too close, which Brigham had to sign. This was at 4:34 P.M. It is unclear from the videotape whether Trooper Conklin returned Brigham's driver's license and the rental agreement to him, but Trooper Conklin testified at the suppression hearing that he returned the license. There is no testimony about what happened to the rental agreement. The record is clear that Trooper Conklin launched into his consent to search request immediately after Brigham signed the warning citation. At about 4:35 P.M., 21 minutes after making initial contact with Brigham, Trooper Conklin informed Brigham that one of his jobs is to patrol for contraband. He asked for consent to search, which Brigham gave. Trooper Conklin proceeded to pat-down all the car's passengers, told Brigham to relax and wait over in the grassy area of the ditch, and told all the other passengers to step over to the grassy area and sit down; he later instructed them not to talk to each other. The local officers kept watch over Brigham and the others while Trooper Conklin searched the passenger compartment and trunk of the vehicle. Trooper Conklin opened a cooler in the trunk and then opened a gallon-sized opaque plastic fruit drink container and saw and smelled what he thought was codeine. The record

---

[22] At this point Trooper Conklin had not articulated any particularized objective fact which would justify a suspicion that the car was carrying any contraband which required a search.

indicates Trooper Conklin also found a half-empty soda bottle of codeine. At 4:43 P.M., Trooper Conklin with the assistance of the local officers placed Brigham and all the passengers under arrest.

## II. No Particularized and Objective Basis for Reasonable Suspicion Based on a Totality of the Circumstances.

The majority correctly restates the law that courts may not scrutinize the motives behind otherwise permissible police actions. Whren v. United States, 517 U.S. 806, 811-13 (1996). But in my view, the majority is incorrect in its implied conclusion that it therefore follows that courts may not look at the totality of the circumstances to determine as to what illegal activity there was reasonable suspicion of and eliminate any suspicion that is not supported by the facts, i.e., that is not reasonable.[23] The majority insists that Supreme Court precedent supports the propositions that: (1) this Court may hold that there was reasonable suspicion because Trooper Conklin could have believed the car was stolen even though it had not been reported stolen and even though there were no other facts indicating the likelihood it was stolen; and (2) this Court must let Trooper Conklin draw such an inference in support of reasonable suspicion even if such an inference is objectively unreasonable. Proposed Majority Opinion

---

[23] See, e.g., United States v. Arvizu, 534 U.S. 266, 278 (2002) (Scalia, J., concurring) (stating that an officer's observations of suspects as "methodical," "mechanical," "abnormal," and "odd," "are findings of fact that deserve respect. But the inference that this 'would lead a reasonable officer to wonder why they are doing this,' amounts to the conclusion that their action was suspicious, which I would have thought (if de novo review is the standard) is the prerogative of the Court of Appeals") (emphasis added).

at 15 (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)). What the Supreme Court precedent cited by the majority actually states is "[w]hen discussing how reviewing courts should make reasonable-suspicion determinations, [the Supreme Court] ha[s] said repeatedly that [the courts] must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  Arvizu, 534 U.S. at 273.

The majority opinion discounts the objective facts and Trooper Conklin's particularized findings, both of which indicate there was no reasonable suspicion the car was stolen and there was no other particularized or objective reasonable suspicion of wrongdoing. The computer check of the car's license registration indicated it had not been reported stolen.  Further, the record clearly supports the fact that Brigham told Trooper Conklin his mother rented the car; Harris and Brigham were of the ages that they could be a mother and son, respectively; and Brigham's address matched the address of Harris on the rental papers.  To the extent some of these facts were overlooked by the district court, I would find the district court to have clearly erred.  Most importantly, while waiting for the results of the driver's license checks to return, Trooper Conklin recorded orally on the videotape a message to himself that: (1) "as to the rental agreement, the subjects were neither 25 years old nor listed on the rental agreement (Harris had rented the car)"; (2) "the subjects seemed nervous (hands were

31

shaking) and neither Brigham nor Franklin had made eye contact with Trooper Conklin"; (3) "all four individuals appeared to lack legal standing as to the vehicle because they were not listed as authorized drivers"; and (4) "they had conflicting stories about their arrival time in Houston and who they had visited there."

The majority states that "[t]he panel's concern that questioning unrelated to the purpose of a traffic stop may unconstitutionally extend a detention is valid, in abstract terms, but not on the facts of this case." Proposed Majority Opinion at 19. Not true. Rather, it is the majority's concern that the car could have been stolen even though the car was not reported stolen that is valid in the abstract, but not on the facts of this case, where such a conclusion is belied by what occurred in terms of the "clean" computer check, by the stopping officer's clear indication of what he had suspicions of, and the lack of a particularized and objective suspicion of any other illegal activity.

Applying the proper standard of review that gives due respect to the officer and his experience but does not provide the officer with a carte blanche to make non-particularized and non-objective inferences, the facts indicate Trooper Conklin had no reasonable suspicion about car theft and could have had no reasonable suspicion of any other particular wrongdoing. He may have had some questions about the contractual rights of Brigham to drive the car – but this of course is not a matter of criminal law. Likewise, Trooper Conklin's views on the standing of the occupants to protest

32

a search are wholly irrelevant to evaluating reasonable suspicion of car theft.  Further, not only were there no facts on which to base a reasonable suspicion that the car was stolen, once the computer check indicated the car had not been reported stolen, but our case law also indicates the other facts--nervousness, lack of eye contact, the authorized driver not being present, and some inconsistent responses to detailed travel questions--are insufficient to support reasonable suspicion of drug trafficking. United States v. Santiago, 310 F.3d 336, 342 (5th Cir. 2002); United States v. Valadez, 267 F.3d 395, 396-99 (5th Cir. 2001); United States v. Jones, 234 F.3d 234, 241-42 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 199-200 (5th Cir. 1999).[24]

Our Circuit's case law holds that "[t]he suspicion required to justify such a detention need not rise to the level of probable cause but must be based on more than an unparticularized suspicion or hunch." Jones, 234 F.3d at 241 (emphasis added).  Further, the detention's scope must be strictly tied to the particularized suspicion justifying the detention in the first place. Dortch, 199 F.3d at 199.  The majority opinion disregards these requirements and simply concludes that Trooper Conklin had reasonable suspicion – but never says of what.  As indicated, there was no reasonable suspicion to support the belief the car was stolen and no other facts justifying a continued detention.  In ignoring the facts of

---

[24]    As far as I can tell the majority's opinion makes no attempt to overrule all or any part of these cases so their holdings remain in full effect.

33

the case and our precedent, the majority opinion errs in two respects. First, according to the majority, the Fourth Amendment only requires reasonable suspicion of some non-specific wrongdoing. Second, the majority suggests that several objective facts, including a negative computer check, cannot extinguish this non-specific suspicion.

The first error is clearly contrary to this Circuit's precedent. See Jones, 234 F.3d at 241. Unfortunately, the majority does not address the requirement that reasonable suspicion be of particularized wrongdoing based on objective facts. The second error of the majority opinion is in direct contradiction to what was the well-established rule in this Circuit. See, e.g., id.; Dortch, 199 F.3d at 198-99; see also United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993) (noting that the detention following a stop must be tailored to its underlying justification and that, once an officer conducts a pat-down search of an individual suspected only of carrying a gun, the officer, upon finding no weapon, may not further detain the person to question him because there is no longer an underlying justification). Dortch and Jones at least stand for the proposition that when an officer has reasonable suspicion of a stolen car, questioning after the completion of a negative computer check unreasonably extends the detention. This proposition implies that a negative computer check can definitively dispel reasonable suspicion of auto theft in the absence of particularized and objective facts that would

34

indicate a reasonable suspicion of auto theft still exists.

Accordingly, under our law prior to the majority's opinion, the stop could not be extended beyond the checking of the license and registration.

**III. The Logical Application of Traffic Stop Precedent.**

The majority indicates that to hold, as the panel opinion did, that the stop was unreasonably extended creates an "absurd" rule of law that somehow requires an officer to immediately obtain the driver's license and registration and initiate relevant background checks before questioning. Again, not true. The actual panel holding, not the majority's interpretation thereof, was that in the absence of reasonable suspicion an officer could not do an end run around this Circuit's case law, i.e., Dortch, Jones, and Santiago, which makes it impermissible to extend the stop after the license and registration checks come back "clean," by prolonging the detention on the front end by not running the computer check in an effort to develop reasonable suspicion when none existed.[25] Inserting an illogical sequence requirement into our law, the majority states that our case law is "about timing and sequence:

---

[25] The majority indicates in a footnote in support of its argument that the panel opinion impermissibly requires immediate license and registration computer checks because an officer might occasionally find such checks unnecessary where the driver's license and registration appear regular via a visual inspection and the occupants answer questions clearly. Proposed Majority Opinion at 19 n.13. Of course, if an officer has a legitimate reason for stopping a vehicle and then after visually inspecting the license and registration ends the stop because the officer decides not to issue a citation, there is no unreasonable detention. Neither the majority nor the panel opinion has ever suggested otherwise.

35

after the computer checks came up 'clean,' there remained no reasonable suspicion of wrongdoing by the vehicle occupants. Continued questioning thereafter unconstitutionally prolonged the detentions." Proposed Majority Opinion at 17 (citing Valadez, 267 F.3d at 398-99). The majority applies the Dortch, Jones, Santiago line of cases in such a way that an officer may not unreasonably extend a traffic stop on the back end (after receiving answers to computer checks), but under the majority's new holding in this case the officer is free to do so on the front end. The result of the majority's opinion is plainly illogical, and is precisely the technique used by Trooper Conklin to avoid the inhibitions of Dortch, et al.

Further, in an effort to reach this result the majority takes several leaps over the established law of the Supreme Court and this Circuit concerning traffic stops.

First, the majority insists that Supreme Court case law supports the proposition that there is no constitutional stopwatch on traffic stops. Proposed Majority Opinion at 19. But such a broad statement, misses the mark the Supreme Court clearly established when it instructed courts to "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." United States v. Sharpe, 470 U.S. 675, 686 (1985). It seems clear to me that the delay and extended questioning in this case was not confirming or

36

dispelling suspicions in a diligent, much less "quick," manner.[26] This fact is made even more evident considering the one set of questions that Trooper Conklin never asked of Brigham or the passengers was when, where, and from whom did Brigham get possession of the rented car?  As we have stated before, questioning on unrelated matters that extends the stop can make the detention unreasonable.  <u>United States v. Machuca-Barrera</u>, 261 F.3d 425, 432–33, n.21 (5th Cir. 2001).

Second, the issues of whether passengers can be questioned, have their licenses checked, or be removed from the vehicle and

---

[26]    In <u>Florida v. Royer</u>, a plurality of the Supreme Court addressed the permissible scope of a <u>Terry</u> stop in the midst of offering several observations about the Fourth Amendment.  460 U.S. 491 (1983).  It stated, in part:

> The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible.  The reasonableness requirement of the Fourth Amendment requires no less when the police action is a seizure permitted on less than probable cause because of legitimate law enforcement interests. The scope of the detention must be carefully tailored to its underlying justifications.
>
> The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect.  The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case.  This much, however, is clear:  an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

<u>Id.</u> at 500 (citations and internal quotation marks omitted).  Although this case was decided by only a plurality of the Justices, there is no indication the plurality resulted because of the discussion of general principles that relate to this case.  In fact, in his concurrence, Justice Brennan explained, "I interpret the plurality's requirement that the investigative methods employed pursuant to a <u>Terry</u> stop be 'the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time,' to mean that the availability of a less intrusive means may make an otherwise reasonable stop unreasonable."  <u>Id.</u> at 511 n.*(Brennan, J., concurring in the result)(internal citation omitted).

separated, and what value any information gleaned from the passengers could be to Trooper Conklin in building an ex post facto reasonable suspicion was simply not addressed by the parties in this case and has never been decided by this Circuit. But the majority by its sweeping opinion in this case, citing only an Eighth Circuit case permitting the questioning of passengers, has significantly expanded the scope of what is reasonable police conduct during a traffic stop.

## IV. Dangers Inherent in the Majority's Holding.

The propriety of and motivations behind the somewhat suspect initial stop in this case are not before the Court.[27] But in the words of Justice O'Connor in her dissent in Atwater v. City of Lago Vista, joined by Justices Stevens, Ginsburg, and Breyer, "it is precisely because these [subjective] motivations are beyond our purview that we must vigilantly ensure that officers' poststop

---

[27] In this case there is the unspoken issue of racial profiling. I recognize that counsel for Brigham neither challenged the initial propriety of the traffic stop for following too closely, nor did he raise an Equal Protection claim based on an impermissible racial classification (i.e., the unequal enforcement of laws based on race), nor did he raise a Fourth Amendment challenge based on an illegitimate use of race as a factor for reasonable suspicion. But in my view, the obvious facts of this case, i.e., four young African-Americans traveling in a vehicle with out-of-state license plates stopped on a public highway in East Texas by a white highway patrolman for "following too closely" and then interrogated for 20 minutes about matters unrelated to the reasons for that stop, are so suggestive of circumstances in which racial profiling typically occurs that the district court and our Court fail in our responsibility to the hundreds of our minority citizens who daily exercise their constitutional right to travel in interstate commerce without harassment when we close our eyes and minds to the reality of these circumstances. Texas now has enacted statutes prohibiting racial profiling and requiring law enforcement agencies to develop plans to eliminate the use of racial profiling and keep track of data concerning traffic stops and arrests. See TEX. CODE CRIM. PROC. ANN. art. 2.131-137 (Vernon Supp. 2004). Regrettably, these statutes were not yet effective when Brigham was stopped.

actions-which are properly within our reach--comport with the Fourth Amendment's guarantee of reasonableness." 532 U.S. 318, 372 (2001) (O'Connor, J., dissenting). The majority opinion fails to do just that. In other words, we may be unable to remedy the initial wrong that potentially occurred in this case because of a technical or procedural rule, but we are not prevented from remedying the post-stop constitutional violation that actually occurred.

I predict that the holding in this case will lead to further infringement on the privacy of the traveling public. The majority opinion permits a law officer to make a traffic stop for a minor and innocuous traffic violation and then expand that stop into a full-blown interrogation of the driver and all occupants of the vehicle as to where they are going, where they have been, where they stayed, what they did, whom they talked to, and what events they attended. This results in a fishing expedition to see if the vehicle's occupants have engaged in any criminal conduct other than the traffic violation for which the stop was made. The majority opinion permits the officer, during the pendency of the stop, to require the driver and all occupants of the vehicle to vacate the vehicle, be subjected to a pat-down search for weapons, and be required to separate and stay outside of the vehicle at locations specified by the officer separate and apart from each other, all without any conduct on the part of the driver or the occupants that threatens the safety of the officer in any way. Likewise, the

39

majority opinion will now allow the officer to require each occupant in the vehicle to furnish sufficient identification to allow the officer to run a computer check on each individual without any suspicion that such occupant has committed any offense. The majority opinion will permit the officer after running a computer check on the registration of the vehicle and getting a "clean" report to continue to interrogate the driver and occupants about whatever subject he chooses. All this can be done without any particularized or objectively reasonable suspicion of criminal conduct; and all of this may be conducted in whatever sequence and over whatever time frame the officer chooses. Finally, if the officer discovers any contraband in the vehicle, he may seize it so long as the officer can testify at a subsequent suppression hearing that in his opinion the driver and the occupants were nervous, would not establish eye contact with him, and gave slightly conflicting answers to the unrelated interrogating questions which were posed to them.

The majority's opinion is another step in the direction of judge-developed law that says the end justifies the means; that makes the finding of contraband or drugs the ultimate test of reasonableness; that concludes that if law enforcement officers find drugs the search was <u>a priori</u> reasonable. I have previously expressed my concern about this process of diluting the protections of the Fourth Amendment by giving too broad an interpretation to what constitutes "reasonable police actions." <u>See</u> <u>United States v.</u>

40

<u>Gould</u>, 364 F.3d 578, 605 (5th Cir. 2004) (DeMoss, J., dissenting) (referring to the unhooking of the protective sweep exception from the requirement of being part of the execution of an arrest warrant as effectively eliminating the need for complying with the Fourth Amendment under the guise of finding almost everything reasonable). I suppose it would be constitutionally possible for the Texas Legislature or the United States Congress to adopt a statute that says that merely by operating a vehicle on a public highway every operator shall be deemed to have consented to a search of that vehicle for contraband whenever that vehicle is stopped for any traffic violation. Because of the obvious potentials for abuse from such a law, I hope that neither the Legislature nor the Congress would ever have enough votes to enact it; but I am dead certain that the courts do not have the constitutional authority to achieve that end simply by construing what is reasonable. I respectfully dissent.