**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 14, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CARLOS GUADALUPE
BELTRAN-AGUILAR,

Defendant-Appellant.

No. 09-3346
(D.C. No. 2:08-CR-20106-KHV-1)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY** and **BALDOCK**, Circuit Judges, and **BRORBY**, Senior
Circuit Judge.

---

Carlos Guadalupe Beltran-Aguilar ("Aguilar") appeals his 360-month

sentence for possessing fifty grams or more of methamphetamine with intent to

distribute, conspiring to distribute and to possess fifty grams or more of

methamphetamine with intent to distribute, and maintaining a residence for those

purposes. He argues that the district court erred procedurally, by applying an

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

importation enhancement to his base offense level, and substantively, by imposing an unreasonably long sentence. We affirm.

## BACKGROUND

Jose Viera, a Mexican national in this country illegally, was a methamphetamine dealer in Kansas City, Kansas. In early 2008, Viera and his girlfriend, Perla Flores, moved into a house on Metropolitan Avenue. They used the house to store and cut "half pound" portions of methamphetamine obtained from Mexican nationals Jose Antonio Beltran-Salazar ("Salazar") and Roberto Quinonez-Quintero ("Quintero"). R., Vol. 2 at 923. Appellant Aguilar was one of Quintero's assistants and a lawful permanent U.S. resident.

According to Flores, in April of 2008, Salazar and Quintero's U.S. supply of methamphetamine ran out, prompting Viera, Salazar, and Quintero to travel to Mexico for a "meeting." *Id.* at 926-27, 929-30. Flores was apparently unfamiliar with Aguilar at this time. But border patrol records show that Aguilar also crossed into Mexico in April, and that he re-entered the U.S. through Arizona on June 30, driving a vehicle registered to a woman in Omaha, Nebraska. The vehicle was not searched. Several days later, Viera, Quintero, and another one of Quintero's assistants, Jose Torres-Garcia ("Garcia"), attempted to enter the U.S. at other locations, but they were apprehended and returned to Mexico. No drugs were found in their possession. Eventually, they succeeded in entering the U.S., and they traveled to Omaha.

-2-

On July 18, 2008, Viera, Quintero, Aguilar, and Garcia arrived at the Metropolitan Avenue residence with four to six pounds of methamphetamine. They spent the next two weeks in the home, cutting and distributing the drug. Flores testified that Aguilar "was always there with them" providing assistance. *Id.* at 991.

In August 2008, Aguilar moved into a residence on North 50th Street in Kansas City. On August 27, 2008, police officers conducting surveillance observed Aguilar leave that residence in a vehicle with Nebraska license plates and proceed to a store, where he bought a box of laundry detergent. Aguilar then returned to the home. After about twenty-five minutes, Aguilar emerged with Quintero, Salazar, and Garcia. Aguilar and Garcia got into a black Honda and followed Quintero and Salazar, who were driving the Nebraska-licensed vehicle. Both vehicles eventually proceeded north on the interstate toward Nebraska.

After about an hour, a Missouri state trooper stopped the Honda, which was being driven by Aguilar, for speeding. When the trooper walked up to the passenger compartment, he noticed multiple air fresheners and two prepaid cell phones, and that both Aguilar and Garcia were wearing bracelets depicting Jesus Malverde, "the patron saint of . . . drug smugglers." *Id.* at 587. A consensual search of the vehicle yielded the box of laundry detergent, inside of which were two pounds of 69% pure methamphetamine wrapped in cellophane. Aguilar and Garcia were arrested. A search of Aguilar's wallet revealed a wire transfer

receipt from earlier in the day indicating that money had been sent to Salazar's address in Mexico. Further, a trooper scrolled through the numbers in one of the cell phones and recognized international phone numbers. The trooper testified that in his experience, methamphetamine has an international source—"Mexico." *Id.* at 598. An agent with the Bureau of Immigrations and Customs Enforcement (ICE) similarly testified that "the majority of the time, [methamphetamine] is brought in from Mexico" because the precursor ingredients are more accessible there. *Id.* at 172-73.

After being arrested, Aguilar consented to a search of the North 50th Street residence, and he gave officers the keys. Inside, they found $18,000 in cash on a closet shelf, along with a Western Union receipt bearing a fake name used by Quintero for a money transfer to Mexico. Also found in the house were a digital scale, a drug ledger, cellophane, methamphetamine cutting agent, and shrines to Santa Muerte (Saint Death) and Jesus Malverde. A 9mm handgun was found in Aguilar's bedroom.

Several months later, Viera and Flores were arrested. A search of their residence revealed a drug ledger, bundles of cash, and several receipts bearing a fake name used by Viera to wire money to Mexico.

Aguilar was tried by a jury and convicted on three counts: (1) possessing more than fifty grams of methamphetamine with intent to distribute; (2) conspiring to distribute and to possess more than fifty grams of

-4-

methamphetamine with intent to distribute; and (3) managing or controlling a place to distribute or store methamphetamine. The U.S. Probation Office prepared a presentence report (PSR), setting the base offense level at thirty-six, and then applying a two-level enhancement for the gun found in Aguilar's bedroom. Both the government and Aguilar objected and filed memoranda. The government argued that the amount of methamphetamine at issue in the conspiracy required a base offense level of thirty-eight, and that in addition to the gun enhancement, there should have been a two-level enhancement for importing methamphetamine into the U.S. Aguilar contested those points and argued that he was entitled to a four-level downward adjustment as a minimal participant in the conspiracy, and that the 18 U.S.C. § 3553(a) factors warranted a lenient sentence.

At the sentencing hearing, the district court determined that the amount of methamphetamine exceeded 1.5 kilograms, thereby providing a base offense level of thirty-eight. *See* U.S.S.G. § 2D1.1(c)(1). The court also applied the gun and importation enhancements, reaching a Guidelines sentence of 360 months to life imprisonment on the trafficking and conspiracy counts, and 240 months to life on the drug-residence count. As to the importation enhancement, the court explained: "the evidence is overwhelming in this case that this was a Mexican-based drug cartel and [Aguilar] had to know that the methamphetamine in this case originated from Mexico." R., Vol. 2 at 1175-76.

The court also heard argument as to whether Aguilar was entitled to a minimal-participant adjustment and to a downward variance based on the § 3553(a) factors. The court found that while Aguilar was not "a minor or minimal player in the conspiracy," *id.* at 1190, it could consider his relative culpability "in deciding where within the guideline range [he] should be sentenced," *id.* at 1191. Regarding Aguilar's request for a guidelines variance based on his youth, recent fatherhood, and his claim that "[he] was not aware of the activities that [his friends] were engaged in," *id.* at 1195, the district court imposed a 360-month sentence, explaining:

> I realize this is a long sentence and I realize that I have discretion to give you a lower sentence. In declining to do that, I am satisfied not only by the reasons the government has stated,[1] but what I see is an utter lack of acceptance of responsibility and . . . false minimalization of your role in this offense and also the effort to somehow lay this off on your friends which, frankly, is pretty offensive to me . . . . I think it's obvious that you were a knowing and voluntary and maybe even eager participant in everything that you did.

*Id.* at 1210.

---

[1] In support of a sentence within the Guidelines range, the government argued that Aguilar clearly knew what was transpiring, given that he controlled a house from which methamphetamine was stored and distributed, had shrines and a bracelet associated with narcotics trafficking, and was involved in the distribution of "enough methamphetamine to affect hundreds of users," *id.* at 1204. Further, the government asserted that Aguilar "chose to leave his son to engage in this drug trafficking and only stopped when he got arrested." *Id.* at 1206.

## DISCUSSION

We review a sentence for reasonableness, applying an "abuse-of-discretion standard of review." *Gall v. United States*, 552 U.S. 38, 46 (2007). Reasonableness review has both procedural and substantive components. *United States v. Martinez*, 610 F.3d 1216, 1223 (10th Cir.), *cert. denied*, 131 S. Ct. 543 (2010). "Review for procedural reasonableness focuses on whether the district court committed any error in calculating or explaining the sentence." *United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009). "Review for substantive reasonableness focuses on whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Id.* (quotation omitted).

### I. Procedural Reasonableness - Importation Enhancement

So long as a defendant is not a minor or minimal participant in the criminal activity, the Sentencing Guidelines provide a two-level enhancement if "the offense involved the importation of . . . methamphetamine." U.S.S.G. § 2D1.1(b)(4). Aguilar argues that there was insufficient evidence to establish that the methamphetamine in this case was imported from Mexico. He acknowledges, however, that the government must prove a sentencing enhancement by only a preponderance of the evidence. *United States v. Gambino-Zavala*, 539 F.3d 1221, 1228 (10th Cir. 2008).

-7-

Here, the evidence indicated that the methamphetamine possessed and distributed by the conspirators originated in Mexico and that Aguilar would have known of that fact.[2]  Specifically, Flores testified that Salazar, Quintero, and Viera traveled to Mexico in April 2008 after exhausting the methamphetamine they had in this country.  That same month, border patrol records indicate that Aguilar also crossed into Mexico.  While in Mexico, Salazar, Quintero, and Viera had a meeting to discuss continuing their methamphetamine operation.  After being in Mexico for two months, Aguilar and the others began their attempts to re-enter the U.S.  Aguilar, the only one in the group who was a lawful permanent resident, entered separately from his co-conspirators.  The clear import of that separate entry was to avoid the suspicion that would have been aroused by coming across with undocumented Mexican nationals.  Further, when Quintero, Viera, and Garcia were apprehended attempting to cross the border, they were not carrying any methamphetamine.  Yet, when everyone arrived at the Metropolitan Avenue residence after a stop in Nebraska, they had four to six pounds of methamphetamine.  It is fairly obvious that Aguilar drove that methamphetamine

---

[2]    The plain language of § 2D1.1(b)(4) appears to impose a scienter requirement only when "the offense involved . . . the manufacture of . . . methamphetamine from listed chemicals that the defendant knew were imported unlawfully."  When the offense is the importation of methamphetamine, the Guideline is silent regarding knowledge of the drug's foreign origination.  In any event, we need not resolve this issue because the preponderance of the evidence in this case establishes that Aguilar would have known that he and his co-conspirators were operating with methamphetamine imported from Mexico.

across the border.  Indeed, there was no methamphetamine-manufacturing equipment at either of the Kansas City residences, there were multiple wire-transfer receipts showing funds sent to Mexico, and both a state trooper and an ICE agent associated with this case testified about their general experience with methamphetamine coming from Mexico.

Aguilar argues, however, that it is just as likely that the methamphetamine originated in Nebraska.  But if that were true, the conspirators would not have had to travel to Mexico when they ran out of methamphetamine in April.  Further, when Aguilar was arrested, he was transporting methamphetamine *to* Nebraska. If Nebraska were the source, they would not have had to transport methamphetamine there.

Aguilar asserts that "Flores[ ] testified that the supply of drugs at issue in the present conspiracy originated in Nebraska."  Opening Br. at 15.  But he misinterprets the record.  Flores testified that Viera said they met Salazar in Nebraska at a place "where he had the drug meth."  R., Vol. 2 at 934.  She did not, however, testify as to where the methamphetamine originated.  Rather, it appears she was attempting to describe the place from which Salazar operated in Nebraska.  In any event, her confusing testimony on this point does not detract from the other evidence in this case showing Mexico as the origination source.

Despite attempting to rely on Flores's testimony, Aguilar suggests that little weight can be given to her testimony insofar as it indicates a Mexican

origination because she erroneously believed that Aguilar was caught trying to cross the border with the others. That erroneous belief as to a minor detail hardly impugns her testimony, though. The basis of her confusion could easily be explained by the fact that she had been told the conspirators all met near the Arizona border checkpoint and were planning on crossing together. Thus, when the conspirators who eventually crossed together were caught, it would not be unreasonable for her to mistakenly believe that Aguilar was among them.

We conclude that a preponderance of the evidence showed that the methamphetamine in this case came from Mexico, and that Aguilar, as the individual who drove it across the border, arrived with it in Kansas City, and assisted in preparing it for distribution, knew of its foreign origination. Thus, the district court properly applied the importation enhancement to Aguilar's base-offense level.

## II. Substantive Reasonableness - Downward Variance

A sentence within a properly calculated Guidelines range is presumptively reasonable. *United States v. Regan*, 627 F.3d 1348, 1352 (10th Cir. 2010). The defendant may rebut the presumption "by showing that his sentence is unreasonable in light of the sentencing factors delineated in 18 U.S.C. § 3553(a)." *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1215 (10th Cir. 2008). In determining reasonableness, however, "we must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the [sentence

imposed]." *United States v. Alvarez-Bernabe*, 626 F.3d 1161, 1165 (10th Cir. 2010) (quotations omitted).

Aguilar contends that his 360-month sentence is unreasonable because he was a mere drug courier, with limited involvement in the conspiracy. Drug couriers, however, "are an indispensable component of drug dealing networks." *United States v. Martinez*, 512 F.3d 1268, 1276 (10th Cir. 2008) (quotation omitted). And there was evidence that Aguilar was more than a drug courier and had significant involvement in the conspiracy. In this regard, Flores testified that while Aguilar lived in her home, he was always with the co-conspirators, giving them assistance in preparing the methamphetamine for distribution. And when Aguilar moved into the North 50 Street residence, he was the one who bought the laundry detergent box used to hide the two pounds of methamphetamine later found by state troopers. Also, after being arrested, a wire transfer receipt for money sent earlier that day to Mexico was found in his wallet. Further, a gun was found in his bedroom, and there were narcotics-oriented shrines throughout the residence. Consequently, like the district court, we are not persuaded by Aguilar's assertion that he played only a limited role in the conspiracy. Nevertheless, we note that the district court considered the extent of his involvement in selecting a sentence at the bottom of the Guidelines range.

Finally, Aguilar argues that his 360-month sentence is unreasonable because it exceeds the sentences given to Flores (30 months), Garcia (120

months), and Viera (324 months). Under 18 U.S.C. § 3553(a)(6), sentencing courts must "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." But "disparate sentences are allowed where the disparity is explicable by the facts on the record." *United States v. Davis*, 437 F.3d 989, 997 (10th Cir. 2006) (quotation omitted). Further, a co-conspirator's "decision to accept responsibility and assist the government does not create an unwarranted disparity under § 3553(a)(6)." *United States v. Haley*, 529 F.3d 1308, 1312 (10th Cir. 2008).

The disparity between Aguilar's sentence and Flores's sentence is readily explained by the fact that she pleaded guilty and testified for the government. Garcia and Viera also pleaded guilty and were sentenced accordingly. The fact that Aguilar's sentence more closely resembles Viera's rather than Garcia's reflects Aguilar's and Garcia's disparate levels of involvement in the conspiracy.

The district court did not abuse its discretion in refusing to grant Aguilar a downward variance and sentencing him within the Guidelines range.

## CONCLUSION

The judgment of the district court is AFFIRMED.[3]

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge

---

[3] Aguilar has requested permission to file a pro se supplemental appellate brief. But he has been represented by counsel throughout this appeal. Consequently, we "invok[e] our policy of addressing on direct appeal only those issues raised by counsel," and we do not address the issues raised in Aguilar's proffered pro se brief. *United States v. McDermott*, 64 F.3d 1448, 1450 n.1 (10th Cir. 1995). Accordingly, Aguilar's motion to file a pro se supplemental brief is DENIED.