

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-17-00026-CR

MONROE LATERRIO BELL, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 44317-B

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

During a traffic stop in Gregg County, Texas, State Trooper Jacob Muehlstein found more than 400 grams of cocaine in the trunk of Monroe Laterrio Bell's car. Bell moved to suppress the cocaine, arguing that the traffic stop was improperly prolonged. The trial court denied his motion to suppress, and Bell pled guilty to possession of 400 or more grams of a controlled substance with intent to deliver. The trial court sentenced Bell to twenty years' imprisonment, pursuant to his plea agreement with the State.

On appeal, Bell contends that the trial court erred in denying his motion to suppress. Because we find that the trial court did not abuse its discretion in denying the motion to suppress, we affirm the trial court's judgment.

## I.      Factual and Procedural Background

While patrolling Interstate 20 in Gregg County, Texas, Trooper Muehlstein saw a white Chevrolet Impala following another vehicle too closely. When Muehlstein accelerated to catch up to the Impala, it exited the interstate so abruptly that he was unable to exit with it. The abrupt exit left Muehlstein with the impression that the car was avoiding him. Muehlstein continued along Interstate 20 for a few miles, and "within just a couple of moments," he saw that the Impala was back on the interstate, and, once again, following another vehicle too closely. The second time, Muehlstein initiated a traffic stop.

Bell was the only person in the car. When asked, he gave Muehlstein his driver's license and rental agreement for the car. Muehlstein made several observations which he considered to be suspicious during his initial approach to Bell. First, the fact that the car was rented was

2

significant because, according to Muehlstein, drug traffickers often transport drugs in rental cars to avoid forfeiture of their personal vehicles in the event drugs are discovered by law enforcement. Muehlstein also considered it significant that Bell was wearing a necklace containing a Santa Muerte charm. Muehlstein testified that the Santa Muerte charm, also known as the Saint of Death charm, is commonly associated with narcotics traffickers.[1] Finally, Muehlstein testified that Bell was unusually nervous during the stop.

At Muehlstein's request, Bell got out of his car and sat in the front seat of the patrol car while Muehlstein ran a computer check of Bell's car, driver's license, and criminal history. While waiting for the results from the computer check, Muehlstein asked Bell a few questions. First, he asked Bell the destination to which he was traveling. In response, Bell explained that he was traveling from his oilfield work in the Dallas area to Shreveport to visit his mother. He also said that he was driving a rental car because his vehicle had recently been in an accident.

Next, Muehlstein asked Bell if he had ever been arrested before. Bell said that, as a juvenile, he had been arrested for "some burglary charges, some minor . . . offenses." However, the criminal background check "came back with numerous other charges" against Bell, including weapons and narcotics charges that Bell had failed to mention. Finally, when Muehlstein asked Bell why he had exited the highway so abruptly earlier, Bell explained that he wanted a "fruit punch." Muehlstein noted that no gas stations or convenience stores were visible from the exit, and, in his opinion, the time between Bell's exit and his return to the interstate was too short for even a quick stop at a convenience store.

---

[1]*See infra* note 3.

Muehlstein explained his suspicions of narcotics trafficking to Bell and asked for permission to search the car, but Bell refused. Muehlstein then called for a K-9 unit. Due to the location of the stop, it took about twelve minutes for the K-9 unit to arrive, but after arriving, the drug dog alerted to the presence of a controlled substance in the car. Muehlstein then searched the car and found what was later determined to be more than 400 grams of cocaine in the trunk.

Bell was indicted for possession of 400 or more grams of a controlled substance with intent to deliver.[2] At trial, Bell moved to suppress the evidence found during the stop, arguing that the stop was improperly prolonged beyond its purpose. When his motion to suppress evidence was denied, Bell pled guilty to possession of a controlled substance with intent to deliver, and, pursuant to the plea bargain agreement, was sentenced to twenty years' imprisonment. Bell timely filed this appeal of the denial of his motion to suppress evidence.

## II. Standard of Review

In his sole point of error, Bell contends that the trial court should have suppressed the evidence found in the car because the stop was improperly prolonged beyond its purpose without sufficient cause. The standard of review applicable to motions to suppress evidence is well-known.

> "We review the trial court's decision to deny [a] motion to suppress evidence by applying a bifurcated standard of review." *Young v. State*, 420 S.W.3d 139, 141 (Tex. App.—Texarkana 2012, no pet.) (citing *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd); *Rogers v. State*, 291 S.W.3d 148, 151 (Tex. App.—Texarkana 2009, pet. ref'd)). "Because the trial court is the exclusive trier of fact and judge of witness credibility at a suppression hearing, we afford almost total deference to its determination of facts supported by the record." *Id.* (citing *State v. Ross*, 32 S.W.3d 853, 856–57 (Tex. Crim. App. 2000); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d

---

[2]Paragraph B of the indictment also alleged a prior conviction for possession of 400 grams or more of a controlled substance, but the allegation was abandoned as part of the plea agreement.

85, 89 (Tex. Crim. App. 1997)). "We also afford such deference to a trial court's ruling on application of law to fact questions, also known as mixed questions of law and fact, if the resolution of those questions turns on an evaluation of credibility and demeanor." *Id.* (citing *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996)).

We apply a de novo review to the trial court's application of the law and its determination of questions not turning on credibility. *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd). "Since all evidence is viewed in the light most favorable to the trial court's ruling, we are obligated to uphold the denial of [Fisher's] motion to suppress if it was supported by the record and was correct under any theory of law applicable to the case." *Young*, 420 S.W.3d at 141 (citing *Carmouche*, 10 S.W.3d at 328; *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999)). "In determining whether a trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing, because the ruling was based on that evidence, rather than evidence introduced later at trial." *Id.* (citing *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996)).

*Fisher v. State*, 481 S.W.3d 403, 406–07 (Tex. App.—Texarkana 2015, pet. ref'd).

In *Fisher v. State*, we summarized the general rules regarding traffic stop detentions as

follows:

"Police officers may stop and detain a person if they have a reasonable suspicion that a traffic violation is in progress or has been committed." [*Young*, 420 S.W.3d at 141] (citing *Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992)). "A traffic stop is a detention and must be reasonable under the United States and Texas Constitutions." *Id.* (citing *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997); *Caraway v. State*, 255 S.W.3d 302, 307 (Tex. App.—Eastland 2008, no pet.)). "To be reasonable, a traffic stop must be temporary and last no longer than necessary to effectuate the purpose of the stop." *Evanoff v. State*, Nos. 11-09-00317-CR & 11-09-00318-CR, 2011 WL 1431520, at *5 (Tex. App.—Eastland Apr. 14, 2011, pet. ref'd) (mem. op., not designated for publication) (citing *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Davis*, 947 S.W.2d at 245)). "Reasonableness is measured in objective terms by examining the totality of the circumstances." *Young*, 420 S.W.3d at 142 (citing *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Spight v. State*, 76 S.W.3d 761, 765 (Tex. App.—Houston [1st Dist.] 2002, no pet.)). "An investigative stop that is reasonable at its inception may violate the Fourth Amendment because of

excessive intensity or scope." *Id.* (citing *Davis*, 947 S.W.2d at 243 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968))).

In the course of a routine traffic stop, the detaining officer may request a driver's license, car registration, and insurance; use that information to conduct a computer check for outstanding arrest warrants; question the vehicle's occupants regarding their travel plans; and issue a citation. *Kothe v. State*, 152 S.W.3d 54, 63 n. 36 (Tex. Crim. App. 2004) (citing *United States v. Zabalza*, 346 F.3d 1255, 1259 (10th Cir. 2003)); *Davis v. State*, 947 S.W.2d 240, 245 n.6 (Tex. Crim. App. 1997); *Caraway v. State*, 255 S.W.3d 302, 307 (Tex. App.—Eastland 2008, no pet.). "If, during that investigation, an officer develops reasonable suspicion that another violation has occurred, the scope of the initial investigation expands to include the new offense." *Evanoff*, 2011 WL 1431520, at *5 (citing *Goudeau v. State*, 209 S.W.3d 713, 719 (Tex. App.—Houston [14th Dist.] 2006, no pet.)). "Reasonable suspicion must be founded on specific, articulable facts which, when combined with rational inferences from those facts, would lead the officer to conclude that a particular person actually is, has been, or soon will be engaged in criminal activity." *Young*, 420 S.W.3d at 142 (citing *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010)). Yet, the officer does not need to develop reasonable suspicion that a particular crime has been or is about to be committed; rather, the facts need only suggest "that something illegal was afoot." *United States v. Pack*, 612 F.3d 341, 355 (5th Cir. 2010) (citing *United States v. Brigham*, 382 F.3d 500, 509 (5th Cir. 2004)). If such facts exist, "the police [are] entitled, as long as they [act] with reasonable diligence, to pursue several plausible theories in attempting to resolve the suspicion that reasonably had been created . . . ." *Id.* "Whether the totality of the circumstances is sufficient to support an officer's reasonable suspicion is a legal question that we review de novo." *Evanoff*, 2011 WL 1431520, at *5 (citing *Madden v. State*, 242 S.W.3d 504, 511 (Tex. Crim. App. 2007)).

"When the reason for the stop has been satisfied, the stop must end and may not be used as a '"fishing expedition for unrelated criminal activity.'" *Id.* (quoting *Davis*, 947 S.W.2d at 243). "Once the officer concludes the investigation of the conduct that initiated the stop, continued detention of a person is permitted only if there is reasonable suspicion to believe that another offense has been or is being committed." *Id.* (citing *Davis*, 947 S.W.2d at 243). Nevertheless, "[t]here is ... no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Haas v. State*, 172 S.W.3d 42, 51–52 (Tex. App.—Waco 2005, pet. ref'd) (quoting *Brigham*, 382 F.3d at 511; *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)); *see also Kothe*, 152 S.W.3d at 64–65 ("[T]he Supreme Court has expressly rejected placing any rigid time

6

limitations on *Terry* stops . . . .”); *United States v. Sharpe*, 470 U.S. 675, 685–86, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (refusing to establish bright-line rule that twenty minutes too long for *Terry* stop).

*Fisher*, 481 S.W.3d at 407–08.

## III.    Analysis

Bell argues that, even if Muehlstein had probable cause to initially stop him for following too closely to the car ahead of him, the additional information he observed during the traffic stop did not rise to the level of reasonable suspicion or probable cause necessary to continue detaining him.  Specifically, Bell argues that his nervousness, the fact that he was driving a rental car, the fact that he misrepresented his criminal history, and the fact that he was wearing a Santa Muerte charm, taken together, did not amount to sufficient reasonable suspicion to prolong his detention. While no single factor, by itself, necessarily rose to the level of reasonable suspicion, the combination of factors did.  *See Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012) (“Although nervousness alone is not sufficient to establish reasonable suspicion for an investigative detention, it can do so in combination with other factors.  Likewise, a prior criminal record does not by itself establish reasonable suspicion but is a factor that may be considered. Deception regarding one’s own criminal record has also been recognized as a factor that can contribute to reasonable suspicion.” (footnotes omitted)).

Bell further argues that Muehlstein’s reliance on Bell’s possession of the Santa Muerte charm as reasonable suspicion to prolong the detention is “specious” because the charm is a legitimate religious symbol widely used in Catholicism, particularly by those of Mexican heritage. Nevertheless, Muehlstein did not testify that all persons wearing the Santa Muerte charm are

7

narcotics traffickers. Rather, Muehlstein testified that narcotics traffickers commonly wear the Santa Muerte charm.

Of course, the fact that some narcotics traffickers wear the Santa Muerte charm does not make all Catholics who wear the charm narcotics traffickers. Likewise, the fact that some devout Catholics might wear the Santa Muerte charm does not mean that someone wearing the charm cannot be a narcotics trafficker. The wearing of this charm is not reasonable suspicion of narcotics trafficking by itself, and Muehlstein did not assert that it was. But the fact that Bell was wearing the charm as well as the fact that the Santa Muerte charm has been connected to narcotics trafficking, when considered as part of the totality of the circumstances, is an additional factor supporting Muehlstein's determination that probable cause existed to justify Bell's prolonged detention.[3]

Consequently, based on the totality of the circumstances, we find there were "specific, articulable facts which, when combined with rational inferences from those facts, would [have]

---

[3]Other cases have considered evidence of a connection between narcotics traffickers and their "worship" of "Santa Muerte" or "Saint Death," who has been described as "the drug trafficker's god" and who is seen "as a 'protector of drug traffickers and, . . . their famil[ies].'" *Gonzalez v. State*, 984 N.E.2d 725, at *2, *6 (Ind. Ct. App. Mar. 8, 2013) (mem. decision, not designated for publication) (quoting *Traylor v. State*, 817 N.E.2d 611, 621 (Ind. Ct. App. 2004)); *see also United States v. Beltran–Aguilar*, 412 Fed. Appx. 171 (10th Cir. 2011); *United States v. Pena-Ponce*, 588 F.3d 579, 582 (8th Cir. 2009) (officer knew that "Santa Muerte" statue that driver kicked under car seat "is commonly used by drug traffickers for protection"); *United States v. Felix*, No. 2:12-cr-00315-DB-PMW, 2013 WL 474542, at *1 (D.C. Utah Feb. 7, 2013) (not designated for publication) (defendant, stopped for speeding, raised a "Santa Muerte" pendant to his lips and kissed it; officer knew that a "Santa Muerte" depicts the grim reaper, which he knew "was often worn by individuals involved in drug trafficking."); *United States v. Garcia*, No. 2:12-CR-25, 2013 WL 210184, at *2, *2 n.2 (E.D. Tenn. Jan.11, 2013) (officer exercised caution when interacting with defendant in his car because defendant was wearing "Santa Muerte" pendant which officer knew was "worn by members of drug distribution gangs in Mexico"; noting that "fairly or unfairly Santa Muerte has been adopted by members of Mexican drug cartels"); *Mireles v. State*, No. 05-12-00040-CR, 2013 WL 226190, at *4 (Tex. App.—Dallas Jan.18, 2013, no pet.) (not designated for publication) ("the State presented evidence that [defendant] is a follower of Santisima Muerte, or Santa Muerte, which is a religion, or cult, depicted by a skeletal figure resembling the 'grim reaper' and associated with drug traffickers and gangs"; expert witness said that "drug cartel members put the picture of Santa Muerte on kilos of cocaine to protect it.").

lead [Muehlstein] to conclude that [Bell] . . . [was] engaged in criminal activity." *Young*, 420 S.W.3d at 142 (citing *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010)). Accordingly, Muehlstein had reasonable suspicion to continue the detention until the drug dog arrived, and once the drug dog alerted, he had probable cause to search the vehicle.[4]

We overrule this point of error.

## IV.    Conclusion

We affirm the trial court's judgment.

<br>

Ralph K. Burgess
Justice

Date Submitted:     May 15, 2017
Date Decided:       July 28, 2017

Do Not Publish

---

[4]Although Bell does not address it in his brief, Muehlstein's testimony (1) that Bell abruptly exited from the interstate, (2) that Bell's explanation that he exited the interstate to purchase a soft drink was not consistent with Muehlstein's observation that there were no convenience stores or gas stations visible from the interstate at that exit, (3) that there was not enough time between Bell's abrupt exit and return to the interstate for him to have stopped and purchased a soft drink, and (4) that he did not find a soft drink in Bell's vehicle are additional factors that, when considered in the totality of the circumstances, justify Bell's continued detention.