# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 9, 2025

Lyle W. Cayce
Clerk

No. 24-10102

United States of America,

*Plaintiff—Appellee*,

*versus*

Mandis Charles Barrow,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:22-CR-42-1

_____

Before Dennis, Oldham, and Douglas, *Circuit Judges*.

Per Curiam:*

A jury convicted Defendant-Appellant Mandis Charles Barrow of various drug offenses. Barrow challenges the district court's denial of his motion to suppress and its refusal to sever his trial from his co-defendant's. We AFFIRM.

---

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-10102

I

At around 9:00 p.m. on February 18, 2021, Officer Mark Moore noticed a Camaro at the Big Z gas station in Rhome, Texas that lacked a front license plate, in violation of Texas law. Moore used his police vehicle's computer to run a license plate check, but inadvertently mistyped the license plate number. The check returned information on a different vehicle from Fort Worth with a canceled plate and no insurance, also a violation of Texas law. When the Camaro left the gas station, Moore followed and activated his emergency lights. The Camaro drove approximately a quarter mile before turning into a nearby Love's Travel Stop, where it parked for the traffic stop.

Moore approached the driver's side of the Camaro, where Barrow was the driver and Saldana the front passenger. He requested their drivers' licenses and proof of insurance. Saldana presented Moore her cell phone displaying proof of insurance, which appeared facially valid to Moore. But Moore later clarified that "[y]ou could have a valid insurance card, showing it's a valid insurance card. That doesn't mean the insurance is valid, because the insurance company could have cancelled your policy and updated the insurance database." Moore explained to Saldana and Barrow that his check of the license plate indicated that the car lacked insurance. Moore then asked whether the insurance had been recently updated, whether they were the only occupants in the car, who owned the car, whether they still resided at the addresses listed on their driver's licenses, and where they were traveling to and from. They responded affirmatively to each question: the insurance had been recently updated, they were the only occupants, Saldana owned the car, they still lived at the addresses on their licenses, and they were returning to Amarillo from Fort Worth.

Over the next several minutes, Moore photographed the Camaro's VIN, returned to his vehicle, and ran the VIN through his computer three

2

times. He also performed checks on Barrow's and Saldana's driver's licenses and obtained criminal history reports through a dispatcher. Each of the three VIN checks correctly identified the vehicle as a 2019 Camaro registered to Saldana with Texas license plate LPV 5262. At this point, Moore hadn't yet realized he initially mistyped the license plate, so he still thought the license plate didn't match the vehicle. The driver's license checks returned no apparent inconsistencies, and the criminal history checks showed no outstanding warrants. However, the dispatcher did reveal that Barrow was on federal supervised release and had a lengthy criminal history, including drug distribution.

Moore returned to the passenger side of the Camaro and asked Saldana to step out and speak with him. Outside the vehicle, Moore questioned her about the discrepancy between the license plate and VIN information, how she acquired the Camaro, and her relationship with Barrow. Saldana explained that she had purchased the Camaro brand new from a dealership approximately three years ago, that Barrow was her boyfriend, and that they had been dating "for a few months." When asked about the Camaro's registration, she explained the dealership gave her a registration sticker that was "good for three years," so she had never personally registered the car. Saldana added that they were in Fort Worth to visit Barrow's brother and denied knowing that Barrow had ever been "in trouble."

While Saldana remained outside the Camaro, Moore returned to the car and questioned Barrow about his criminal history and whether he was currently on probation or parole. Barrow admitted that he had served time in state prison; had been in federal prison until 2017; and was currently on supervision "for drugs," specifically cocaine. Moore then returned to Saldana, who remained outside the Camaro, and questioned her about their travel plans. Saldana stated that they had departed from Amarillo earlier that

morning, spent the day in Fort Worth, and were now returning to Amarillo. When asked why they visited Fort Worth, Saldana responded that Barrow's uncle recently passed away from COVID, contradicting her earlier statement that they were visiting Barrow's brother.

Moore next asked if there were any drugs or guns in the vehicle. Saldana said there were not. Moore then mentioned he knew that she had a license to carry a firearm, prompting Saldana to state that she was "actually a police officer in Amarillo." When Moore asked if she had any police identification, Saldana initially said she did not but then produced an ID card identifying her as an Amarillo College police officer. Moore asked for a point of contact at Amarillo College he could reach that night to confirm her employment to which, Saldana replied, "[n]o not right now." Moore then asked if she had her Texas Commission on Law Enforcement (TCOLE) card, which verifies a certified police officer's credentials. Saldana said she did not. When asked for her police identification number (PID), which appears on an officer's TCOLE card, she stated that she did not know it. At that point, Moore suspected that Saldana had committed a crime in his presence—"impersonating a police officer," because it was odd for a police officer not to carry identification. Moore contacted dispatch to request a K-9 unit to conduct a free-air sniff of the vehicle. The K-9 arrived, performed a sniff test of the Camaro, and alerted to the odor of narcotics coming from inside the vehicle. A subsequent search of the Camaro revealed $17,000 and approximately 3,836 grams of methamphetamine in the glove box and a shoe box in the trunk of the Camaro. Barrow and Saldana were both placed under arrest.

A grand jury indicted Barrow on three counts: (1) conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine; (2) distribution and possession with intent to distribute 500 grams or more of methamphetamine on or about October 6, 2021; and

No. 24-10102

(3) possession with intent to distribute 500 grams or more of methamphetamine on or about February 18, 2021. The grand jury charged Saldana as a co-defendant on Counts 1 and 3. Barrow moved to suppress the evidence obtained from the traffic stop, which the district court denied. Barrow and Saldana proceeded to trial together. In her closing argument, Saldana's lawyer attributed the contraband found in the traffic stop to Barrow and contended that she was unaware of the contraband or the existence of any drug conspiracy. Barrow did not object. At the close of trial, the district court raised whether Saldana's closing argument warranted severing the trials but ultimately found the burden for severance was not met. The jury convicted Barrow on all three counts and acquitted Saldana on her two counts. Barrow timely appeals.

## II

Barrow raises two arguments on appeal. First, that the district court erred in denying the motion to suppress. And second, that it erred in declining to sever the trials after Saldana implicated Barrow in her closing argument. We address each in turn.

## A

To evaluate whether a Fourth Amendment violation occurred during a traffic stop, we first ask if "the officer's action was justified at its inception" and then whether the officer's subsequent actions were "reasonably related in scope to the circumstances which justified" the stop. *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968). The tolerability of the duration of police questioning during a traffic stop is determined by the stop's mission—for example, a stop's mission may be to address the traffic violation that warranted the stop. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* Tasks related to investigating a traffic

5

violation include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. An officer can also "ask about the purpose and itinerary of a driver's trip." *United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004) (en banc). When reviewing a ruling on a motion to suppress, we review factual findings for clear error and the legality of police conduct de novo, viewing the evidence in the light most favorable to the prevailing party, here, the Government. *See United States v. Cantu*, 230 F.3d 148, 150 (5th Cir. 2000). The district court's ruling "should be upheld if there is any reasonable view of the evidence to support it." *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014).

Our analysis on appeal is narrowed by two concessions. Barrow concedes Moore justifiably initiated the traffic stop because the Camaro lacked a front license plate, in violation of Texas law, and because Moore reasonably believed the vehicle had no insurance, another violation of Texas law.[1] Nor does Barrow dispute that Moore reasonably suspected Saldana of impersonating a police officer—another violation of Texas law—at the time she was unable to recall the PID number on her TCOLE card. Barrow only argues that the initial justifications for the traffic stop disappeared after Moore checked the VIN three times and Saldana showed Moore her insurance card. He posits that from that point on, Moore unconstitutionally extended the traffic stop. The Government responds that Moore did not resolve the insurance issue at that point, but continued investigating the issue

---

[1] Moore inadvertently and unknowingly mistyped the plate, returning information on a different vehicle from Fort Worth that had a canceled plate and lacked insurance. Even though Moore undisputedly mistyped the plate, this also provided a good faith basis to initiate a traffic stop of the car. *United States v. De Leon-Reyna*, 930 F.2d 396, 399 (5th Cir. 1991).

until reasonable suspicion arose that Saldana was lying about being a police officer. We agree.

After receiving three consistent VIN checks, all conflicting with the earlier license plate check, it is apparent Moore felt the issue was unresolved. Importantly, Saldana and Barrow's answers to the questioning furthered Moore's belief that something was afoot with the insurance. When asked if the insurance was recently updated, Saldana answered "yes." Additionally, they confirmed they were coming from Fort Worth, the city where the database told him the cancelled plate had been registered. After running the VIN checks and the driver's licenses, Moore continued to investigate the discrepancy by asking Saldana to step out of the vehicle and specifically stating that he "wanted to talk to her about her car." Moore can be heard explaining the discrepancy to Saldana and asking her about the purchase and registration of the vehicle. Barrow's allegation that Moore was "march[ing] down a path trying to justify reasonable suspicion" is not supported by the record, as he clearly continued to diligently investigate whether the Camaro had insurance.

At the suppression hearing, Moore explained he felt the issue merited additional investigation because a discrepancy between a license plate and the VIN can be the result of a "VIN swap," where a stolen vehicle will switch a license plate out with a different non-stolen vehicle. He explained, in his experience, this issue has arisen in criminal and drug trafficking situations. Barrow's bald assumption that Moore should have simply relied on the VIN results and terminated the stop after six minutes, while still harboring the objectively reasonable belief that the VIN and the license plate did not match, is unreasonable.

Barrow has no response to Moore's explanation regarding VIN swaps, and only argues that Moore's decision not to "rerun the license plate

information . . . does not provide a permissible basis to extend the stop." While it is true that Moore *could* have rerun the license plate number correctly, resolving the discrepancy, Barrow distorts the inquiry. The reasonableness of the stop is judged by "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Brigham*, 382 F.3d at 511. And "[t]o be reasonable is not to be perfect." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). Moore chose to speak to Saldana about the discrepancy between the license plate check and the VIN in lieu of rerunning the license plate number. The district court accepted that explanation. Under our caselaw, this is not reversible error. *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985) ("[T]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it"). We hold the district court did not err in denying the motion to suppress, as Moore's "action was justified at its inception," and his subsequent investigation into the insurance issue was "reasonably related in scope to the circumstances which justified" the stop. *Terry*, 392 U.S. at 19–20.

B

Barrow's second argument is that the district court erred in declining to sever the trials after Saldana implicated Barrow in her closing argument.[2] Federal Rule of Criminal Procedure 14 provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may

---

[2] The parties dispute which standard of review applies here. The Government asks us to review for plain error because Barrow raises the issue for the first time on appeal. But because the district court raised the issue sua sponte, Barrow urges us to apply de novo review. We pretermit that issue and review de novo because even under the more appellant-friendly standard of review, Barrow's challenge fails.

order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *United States v. Zafiro*, 506 U.S. 534, 538–39 (1993).

Even assuming Saldana's attorney's comments during the closing argument rose to the level of a mutually antagonistic defense, the district court instructed the jury that "statements, arguments and questions by lawyers are not evidence," and that "the case of each defendant should be considered separately and individually." Under our precedent, limiting instructions are generally sufficient to cure any prejudice arising from a mutually antagonistic defense. *See United States v. Matthews*, 178 F.3d 295, 299 (5th Cir. 1999). Barrow doesn't contend the general rule should not apply here, so his challenge fails.

## III

For the foregoing reasons, the judgment of the district court is AFFIRMED.